28889, 28925.  WEEKS, administratrix, *v.* POLLARD, receiver; and *vice versa.*

DECIDED JUNE 5, 1941.  REHEARING DENIED JULY 19, 1941.

*W. A. Wooten, O. J. Franklin, R. F. Scarborough, Emory L. Rowland,* for plaintiff.

*A. S. Bradley, Claxton & Claxton,* for defendant.

SUTTON, J. On February 9, 1935, Lester McDaniel brought suit against H. D. Pollard as receiver of the Central of Georgia Railway Company. During the pendency of the suit the petition was three times amended. McDaniel having died, his wife, Mrs. Miller Weeks, qualified as administratrix and was substituted as a party plaintiff.

Count 1, as amended, alleged in substance that during the winter of 1932-1933 Espy Paving & Construction Company was engaged in building a highway near Adrian, Georgia, receiving shipments of road material, rock, sand, and cement. The railroad cars containing the material were transported to Adrian by the defendant, and there being a long passing track parallel with and adjoining the main track, the defendant, for convenience, was using the passing track or sidetrack as its main line, the main line being used temporarily for a sidetrack. The construction company had erected along the main line, and between it and the normal sidetrack, a stationary crane which was used in unloading the shipments of material consigned to it. One or two cars could be placed within reach of the unloading crane at a time, and, as six to eight cars would be brought daily for unloading, one or two of these cars would be placed within reach of the crane, and the others would be placed some distance away. As the cars nearest the crane would be unloaded they would be moved by the construction company's employees eastwardly of the crane, and the loaded cars, on the same track and westwardly of the crane, would be brought within reach of the crane. This track which proceeded alongside the crane was on a slight decline or downgrade, and iron bars would be used under the wheels of the cars to propel them along until they were in reach of the crane. While some employees would propel the cars by the use of iron bars other employees of the construction company would manipulate the brakes, which it was alleged were lever-type brakes, so as to set the brakes and stop the car at the required place, it being the duty of Lester McDaniel to mount the cars and set the brakes. On February 10, 1933, he was engaged in manipulating the brakes on a car which had been brought down to the crane. He had mounted the car for that purpose, and was

standing on a small platform of the car, and as he attempted to release the lever the brake, because of a defect in its mechanism, failed to hold, causing the lever to strike him in the abdomen and seriously injuring him. It was alleged that the defect in the brake was unknown to McDaniel and was known or should have been known to the defendant, and that at the time he was engaged in moving the car with the express consent and authorization of the defendant. By amendment it was alleged that McDaniel had died on June 2, 1937, as a result of the injury he had received.

Counts 2 and 3 contained the same general narrative, alleging that the defendant authorized and consented to the moving of the cars to the crane because the defendant knew, through his employees, that the cars would have to be moved in order to be unloaded by the stationary crane, and knew from day to day and before McDaniel was injured that they were being moved in the manner set forth, inasmuch as the defendant's employees would recover the empty cars at a place different from that where they had been placed as loaded cars. The only substantial difference in the two counts is that in count 2 it is alleged that on the day of McDaniel's injury the defendant's train placed a loaded car within reach of the crane, which the consignee's crew unloaded and moved down the track, and that McDaniel was in the act of bringing down another loaded car when he was injured, whereas in count 3 it was alleged that contrary to its usual practice the train crew failed to place on that day a loaded car within reach of the crane, but took past the crane all of the loaded cars, leaving the last of that string of loaded cars 30 to 40 feet above the crane, and that McDaniel was injured by a defective brake while bringing a loaded car down to the crane.

In count 4 the general narrative is the same as in the other counts except that it is alleged that while McDaniel was bringing down to the crane a car that should have been left there by the defendant, and just as he had almost completed the stopping of the car in proximity to the crane, another car from farther up the track, westwardly of the crane, came loose, proceeded or "ran away" towards and struck the car on which McDaniel was engaged in manipulating the brakes, and caused him to be thrown against the lever and the head of the brake staff and thus severely injured him. This count was added by way of amendment on September 19, 1939,

when the case was called for trial, and the amendment was allowed by the court over the objection of the defendant that it set forth a new cause of action.

In the first three counts it was alleged that the defendant was negligent in failing to exercise ordinary care towards the deceased, in that it furnished a car with defective brakes and did not properly inspect the same to determine the defect. In count 4 it was alleged that the defendant was negligent in failing to complete the delivery of the cars in that it failed to place one of the cars, that next upgrade above the crane, under the crane for unloading; in failing to securely place said cars, in that the defendant failed to properly and sufficiently affix their brakes and failed to chock their wheels to prevent one of the cars from getting loose, as it did, and running downgrade and striking the car upon which the deceased was riding; in failing to chock the wheels on the said "runaway" car so it would not become detached and roll down the incline; in having on said "runaway" car brakes insufficient to hold the same on the incline; in failing to set the brakes on the "runaway" car so as to hold the said car on the incline; in failing to inspect, before placing at Adrian, the brakes on the car which rolled down the incline and struck the car on which the deceased was riding; in having on the car operated by the deceased brakes which were insufficient to hold when struck by the "runaway" car.

General and special demurrers to each count of the petition were overruled, and exceptions pendente lite were duly preserved. When the case came on for trial the court, after introduction of the evidence, directed a verdict for the defendant on all counts of the petition. A motion for new trial on the general grounds, and on the ground that the court erred in directing the verdict, inasmuch as there were issues which should have been submitted to the jury, was overruled, and the plaintiff excepted. The defendant by cross-bill of exceptions assigns error on the overruling of the demurrers.

As an aid in determining whether or not the court should have submitted the case to the jury, as contended by the plaintiff in error, the following evidence is set forth: It was established without dispute that during the winter months of 1932-1933 the Espy Paving & Construction Company was engaged in building a highway near Adrian, Georgia, and that during that time it, as con-

signee, received shipments of road-building material at that point; that Adrian is located on a branch line of the Central of Georgia Railway Company which runs from Dover westwardly to Brewton; that the shipments were made over that railway via Dover; that during all of the time the railway was and is now in receivership with H. D. Pollard as receiver; that the tracks of the railway at Adrian are slightly downgrade in an easterly direction toward Dover; that the construction company unloaded by means of a stationary crane the cars which were placed at Adrian by the railway for the consignee; that this crane was built upon a foundation, constructed by the consignee, between the sidetrack and the main line of the railway at Adrian; that during the delivery of the shipments to the construction company the main line was used as the siding and the sidetrack was used as the main line, the railway placing the loaded cars on what was normally the main line and routing its train around such cars by means of the sidetrack; that the railway operated only one train, a mixed train of freight cars and one or two coaches, daily over this branch line, making one round trip each day from Dover to Brewton; that each day the railway placed from six to ten cars of road-building material for the consignee at Adrian; that these cars were placed next to the engine, and just before the train, coming from the direction of Dover, reached the siding at Adrian the crew would disconnect all cars not to be delivered at Adrian and then pull forward, over the main track, the loaded cars to be delivered to the construction company; that the last of such cars would be left under or within reach of the unloading crane, while the remaining cars would be pulled forward up the tracks thirty or forty feet and there left by the crew, and the engine would back down around the crane to the coach and the other cars, would connect with the same and continue on to Brewton; that it was the practice of the train crew to place or "tie" the brakes only on the end cars of the several loaded cars so placed by them, it being their practice to leave the entire string of cars, except the one placed at or near the crane, coupled; that it was the practice of the construction crew to unload the car that was left at the crane by the train crew, to roll the empty car down the tracks towards Dover and below the sidetrack, and then bring down one of the loaded cars and place it within reach of the crane, which car, upon being unloaded, would in turn be rolled down the tracks;

that upon the return of the train from Brewton it would pick up the empty cars and take them back to Dover, this process being repeated each day, except that if there were any loaded cars on the main line not unloaded when a new string of loaded cars was to be placed there such new string of cars would be placed above or westward of the loaded cars remaining from the preceding day's delivery or placing; that in bringing down a loaded car to the crane for the purpose of unloading, it was the practice of the construction crew to release its brakes, if any were on, or unchock the wheels, if chocked, or uncouple the cars, if coupled, start the same off, if necessary, and then let the car roll downgrade and stop it under the crane by tightening on the brakes at the proper time so as to stop it at or under the crane.

It further appears from the evidence that on February 10, 1933, the date of the injury to McDaniel, the train crew was late in making the trip from Dover, and there were no loaded cars at Adrian for unloading and the construction crew was waiting for the train to arrive with more loaded cars; that just before the engine reached the siding at Adrian the crew disconnected the passenger coach and possibly one or two freight cars at the rear of the train and pulled on up on the main line being used then for leaving the loaded cars for the construction company, the purpose being to leave one loaded car under the crane, to pull up farther the other loaded cars, to detach the engine, and, after placing brakes on the end cars, to take the engine on up the track to the point where the sidetrack joined with the main line, and then to back the engine down the sidetrack to the day coach, pick it and the other cars up and proceed on to Brewton, thus moving around the crane by the use of the sidetrack; that on this day, and after the train crew had left all of the loaded cars westwardly from the crane about forty yards, McDaniel proceeded to bring down to the crane the car that should have been left there by the train crew, the train crew being at this time in the act of backing, on the sidetrack, down to the day coach.

By deposition taken a short while before he died McDaniel testified that when the car upon which he was riding reached the crane he applied the brakes by pulling a lever; that just as he tightened on the brakes sufficiently to hold the car, and just as the brakes caught, he released the lever, but the brakes failed to hold and caused the lever to strike him in the abdomen. However, accord-

ing to E. D. Pittman, who apparently was the only one who was looking at McDaniel when he was injured, just as McDaniel tightened the brakes on the car it was struck from the opposite end by a runaway car from the remaining loaded cars that had been left beyond it by the train crew, and this impact caused McDaniel to be thrown against the brake lever and the head of the brake staff which he was operating and thereby injured him; that McDaniel did not see the runaway car and was so severely injured that he did not know that it was the runaway car that caused his injury; that the train crew had not put brakes on the intervening cars and that the downgrade there was such that ordinarily a loaded car would not run without being started with a push, and the witness could not account for one rolling down that day except the pressure of the loaded cars just beyond it; that the car McDaniel was riding was a high-sided gondola car, loaded with crushed stone, having a brake lever with the cog or ratchet wheel on the floor board of the operator's platform outside of and at the end of the car, and that the catch or latch was worked into the ratchet wheel by the operator's foot; that the impact of the runaway car broke the ratchet wheel into two parts, and that he later examined these parts and found that there was an old crack across the ratchet wheel that could have been discovered by proper inspection.

Charlie Devoes, a witness for the defendant, and the defendant's brakeman who set the brakes on the cars left at Adrian on February 10, 1933, the date of McDaniel's injury, testified that only the brakes on the end cars were set or "tied."

Immediately after McDaniel was injured he was taken to a local physician, who gave him a sedative, and he was then taken home, kept there two days and then taken to a hospital in Swainsboro where his appendix was removed. It was the opinion of the operating surgeon that this trouble was directly caused by the blow he received in the abdomen, and he testified that he found evidence of internal injuries caused by the blow which, in his opinion, later caused cancer of the bowels and which in turn caused the death of McDaniel on June 2, 1937.

The evidence showed that there are two kinds of lever brakes. The principle of operation of the two is the same and their construction similar, in that each operates by means of a brake staff, chain and lever, with the lever attached to the upper end of the

brake staff. The brake rod or staff is about two inches in diameter, and is at the end of the car with the lever attached to the upper end, while the chain is attached to the lower end by means of a bolt. At the end of the car is a small platform upon which the operator stands in braking, this platform being placed to the left of the brake staff so that the operator, in facing the car, has to pull the lever to him with his right hand. This platform is so placed that the head of the brake staff and the lever are about even with the waist line of the operator. The lever is about eighteen inches long, and when not in use hangs down parallel with the brake staff. In operating the brakes the lever is lifted into a horizontal position and then pulled to the operator. The mechanism for catching and holding the brakes, while the operator pushes the lever away from him in order to get another purchase, or in order to hold the brakes when the lever is released, is made up of a disc wheel with notches or cogs into which a latch or ratchet works. This wheel in one kind of lever brakes, the Miner Ideal Safety lever brake, is enclosed in a housing at the top of the brake staff, while the mechanism in the other type, the old style lever brake, is exposed on the floor board of the platform, and in this latter brake the ratchet does not work automatically but must be operated by the foot in unison with the lever. The testimony of McDaniel and the witness E. D. Pittman was that McDaniel was operating an old style brake at the time of his injury and that the car he was moving was loaded with crushed stone. The evidence for the defendant was that all of the cars were inspected by the inspectors of the initial line, then by the defendant's inspectors upon delivery of the cars to the Central of Georgia Railway Company, and again when the empty cars were returned by the defendant to the originating line, and that at none of these inspections were any damaged, defective, or broken brakes discovered.

It was stipulated between the parties or otherwise appeared in evidence that McDaniel was not an employee of the defendant and was not acting at any time under express authority of the defendant; that the defendant did not have any control or direction over his actions with respect to the work he was doing.

There was evidence for the defendant that at Camak, Georgia, where the shipments originated, the Georgia Railroad maintained a force of two car inspectors and that before the cars were placed for

loading they were inspected; that when they were loaded and brought to the station and made up into a train for transportation to Augusta, Dover, and Adrian they were given certain inspection which was in accordance with the Federal safety appliance act and the rules of the Interstate Commerce Commission relating thereto, and that the work of the various inspectors from time to time was checked and supervised by inspectors of the Interstate Commerce Commission; that there were two inspections before the cars were loaded and afterwards, and that the records of the inspections show that there were no defects in any of the cars which went to Adrian and on one of which the decedent was injured; that at Augusta, Georgia, the cars were inspected by two inspectors of the Georgia Railroad before delivery to the Central of Georgia Railway Company, and after receipt by the latter line were inspected and made up into a train at Augusta for transportation to Adrian and were again given an inspection, not only by the regular inspector, but by the yard foreman and the brakeman of the train and by the agent at Augusta. These employees testified that there were no defects in the cars, that the inspections were thorough and in accordance with the rules, and that the brakes were in good working order. The two brakemen who made up the train at Dover testified that they worked the brakes on these cars and that they were in good order when leaving Dover. The two brakemen who handled the cars testified, having their records before them, that when they set the cars out at Adrian for the consignee they set the brakes on the first and last cars, the ground being practically level, being only 75 per cent. grade towards Dover, and that that was sufficient to hold the cars; that when the empties were taken back to Augusta they were again inspected before being delivered to the Georgia Railroad, and when received by the Georgia Railroad they were inspected and the cars put back into regular use; these employees testified that there was no defect in the braking apparatus of any of the cars.

It was stipulated between the parties as follows: "It is stipulated that the records of the Weston & Brooker Company show that it shipped from Camak, Georgia, over the Georgia and Central of Georgia railways by the way of Augusta to the Espy Paving & Construction Company at Adrian, Georgia, as consignee, crushed stone, loaded in the following gondola cars: on February 6, 1933,

A. & W. P. No. 31574, W. & A. No. 11531 and L. & N. No. 56145; and on February 7, 1933, W. of A. No. 10542, W. of A. No. 720, W. of A. No. 10305, A. & W. P. No. 31507 and A. & W. P. No. 31541; that these were the only shipments, made on those two dates, of crushed stone to that consignee at Adrian, Georgia; that the records of the Georgia Railroad show the same, and that these cars were delivered to the receiver of the Central of Georgia Railway at Augusta, Georgia; that the records of said receiver of the Central of Georgia Railway show that these eight cars were received from the Georgia Railroad and were delivered to the consignee at Adrian on February 10, 1933, and that these eight cars were the only cars delivered at Adrian, Georgia, to that consignee on that date, containing crushed stone. It is further stipulated that five of these cars were equipped with the Ajax wheel brake and three with the Miner Ideal lever brake, and that none of them was equipped with the type of brake having the ratchet exposed or on the platform or footboard. It is further stipulated, that during the latter part of the year of 1932, and through January and February, 1933, the Central of Georgia Railway operated one train, a mixed train, on branch line from Dover to Brewton, making one round trip daily from Dover to Brewton and return, and- that W. H. Robertson was, during all of said time, the conductor on said train; that the testimony of said Robertson was not taken for the reason that from prior to the filing of this suit, down to the trial of the same, he was and is insane and unable to testify."

The defendant put in evidence the following documentary evidence: 1. Copy of settlement agreement dated March 24, 1933, between Lester McDaniel and Espy Paving & Construction Company under the workmen's compensation act, signed by McDaniel, in which it was stated that the injury occurred as McDaniel was "releasing brake on high gondola car loaded with stone while in the act of placing car to where stone could be unloaded, brake lever flew back out of control hitting me across stomach." 2. Report to Department of Industrial Relations by Dr. R. C. Franklin, McDaniel's physician, dated February 17, 1933, in which Dr. Franklin reported that McDaniel stated to him that the injury occurred while "releasing brake which was frozen and so would not drop down, consequently flying back striking him in abdomen." 3. Letter dated August 4, 1936, addressed to G. L. Gaillard, gen-

eral claim agent of Central of Georgia Railway Company, Savannah, Georgia, and signed "E. D. Pittman," and reading: "At the time Mr. Lester McDaniel was injured by your company's railroad car he was boarding at my home, and due to the fact that I was the only eyewitness to the seen [scene] if you will see me at once I might be able to save you or your company the $20,000 he is entering suit for. You will find me at Adrian most any time for the next week or two." (As to this letter Pittman testified that he could not write, did not write the letter, and did not authorize anybody to write such a letter for him; that a representative of the railroad came to him at Adrian, wanting him to make a statement about what he knew, and that he refused to do so.) 4. A number of photographs showing the tracks of the Central of Georgia Railway Company at Adrian, Georgia, at the point where loaded cars were placed for the construction company. 5. Photographs showing brake mechanism on car L. & N. No. 56145. 6. Photographs of A. & W. P. car No. 31507 and the brakes thereon.

The trial court directed a verdict for the defendant on the theory that the deceased was, at the time of his injury, not an invitee, but at most a mere licensee, to whom the only duty owed him by the defendant was not to wilfully and wantonly injure him. In this respect we think that, as contended by the plaintiff, the evidence was such as to authorize a finding that he was an implied invitee, and that the defendant, under well-settled principles of law, was under the duty to exercise towards him ordinary care and diligence. It was held in *Savannah, Florida & Western Railway Co.* v. *Booth,* 98 *Ga.* 20 (25 S. E. 928): "Where a railroad company furnishes to one of its patrons a car to be used by him in loading freight to be delivered to it for transportation, it is liable to a servant of the patron for injuries resulting to such servant from the defective construction of the car; provided the defect be of such a character as to be discoverable by the exercise of ordinary care upon the part of the railroad company, and provided further, the injuries complained of were inflicted under such circumstances as that the person injured, by the exercise of ordinary care, could not have avoided the consequences resulting to him from the negligent act of the railroad company in furnishing for the use of such patron and his servants such defective car." The principle ruled is, of course, applicable to the act of unloading a car. In *Seaboard*

*Air-Line Railway* v. *Baker,* 17 *Ga. App.* 529 (1) (87 S. E. 828), it was held: "Servants of shippers or consignees of goods, while loading or unloading the goods from or upon cars on a sidetrack of the railroad carrier, with its consent, express or implied, are not trespassers or bare licensees, and the railroad company is bound to exercise ordinary care to avoid injury to them while they are so engaged." In *Roy* v. *Georgia Railroad & Banking Co.,* 17 *Ga. App.* 34 (2) (86 S. E. 328), it was held: "A railroad company which is a common carrier, if either the initial or the ultimate carrier, transporting a car containing freight, owes a duty to the consignee or his servant, when either the consignee or his servant is engaged in the business of unloading the car after it has arrived at its destination. This duty is to see that the car and its devices for unloading it are reasonably safe for such purpose. This is true although the journey of the car is ended and it has been switched upon a sidetrack belonging to the consignee." In that case it was further held that it was the duty of the railroad company to keep the car in a reasonably safe condition and to inspect it and ascertain whether it was in such condition, and, when it was found to be dangerously defective, to make the necessary repairs or notify the consignee of such dangerous defects. In *Southern Railway Co.* v. *Benton,* 57 *Ga. App.* 520, 522 (196 S. E. 256), it was said: "A railroad company undertaking to furnish machinery or appliances for the use of others in a matter of mutual interest to both parties assumes a duty to furnish proper and reasonably safe appliances." See also *Atlanta & West Point R. Co.* v. *Smith,* 38 *Ga. App.* 20, 24 (142 S. E. 308).

The deceased was not injured in the precise or immediate act of *unloading,* but in moving a loaded car to a crane for unloading, and it is contended by the defendant, and doubtless was the view of the trial judge, that the car was being moved from a place where it could have been unloaded and where the obligation of the defendant had ended, and that the transfer of the car to another place was an act entirely outside of any undertaking in which the consignee and the railway were mutually interested; that it was not an act of unloading and in such an enterprise the deceased could not be regarded otherwise than a trespasser or at most a mere licensee. The plaintiff, on the other hand, contends that, under the practice shown to have existed between the consignee and the railway, the

moving of the car was an integral part of the function of unloading, and that the deceased was, accordingly, acting under an implied invitation to mount and move the car.  In *Paul* v. *Georgia Railroad & Banking Co.,* 60 *Ga. App.* 461 (4 S. E. 2d, 99), it was held that a cause of action was set out in a petition which alleged facts similar to those in the present case and that the act of moving the car was *authorized* by the defendant.  In other jurisdictions, where there was no express authority from a railway for a .car, already placed, to be moved to a more convenient place for loading or unloading, but where it appeared that the railway habitually placed such cars with the knowledge that the consignee's employees would move the same, .an employee so engaged at the time of injury by a defect in the car was an invitee.  See, as instances, Hill *v.* Chicago, I. & L. Co., 188 Ind. 130 (122 N. E. 321) ; Franklin's Admr. *v.* L. & N. R. Co., 155 Ky. 594 (160 S. W. 162) ; McLain *v.* Galveston, H. & H. R. Co. (Tex.), 195 S. W. 292 ; Strayer *v.* Quincy, O. & K. C. R. Co., 170 Mo. App. 514 (156 S. W. 732) ; Waldron *v.* Director General of Railroads, 266 Fed. 196. We regard as sound and adopt as applicable here the principle of law ruled in these cited cases.  It clearly appears from the evidence, much of which has not been set out, that the defendant, before the injury of the deceased, knew of the method adopted by the employer in unloading the cars consigned to it; that the railway daily placed westwardly of the crane of the consignee a number of loaded cars, while fully aware that they would be moved from that location to the crane for unloading, and this knowledge is made manifest by the fact that the cars when emptied were picked up by the defendant's train crew at points eastwardly of the crane.  The defendant could have required the consignee to unload the cars where originally placed, but it was obviously more economical and convenient for them to be unloaded at the crane, and in this practice the defendant acquiesced, deriving at the same time some benefit from this practice for the reason that thereby less switching was involved on the return trip from Brewton.  In these circumstances the deceased, whose duty in part was to move the loaded cars to the crane, was an implied invitee, to whom the defendant owed the duty of furnishing cars which were reasonably safe for the use to which they were put.

*Southern Railway Co.* v. *Morrison,* 105 *Ga.* 543 (31 S. E. 564),

cited and strongly relied on by the defendant, does not require any ruling different from that here made. In that case it was ruled that the plaintiff was barred from recovery because he failed to exercise ordinary care and diligence for his own safety. In the opinion it was said, after discussing some situations in which a master would not be liable for an injury to his servant: "By a parity of reasoning, the servant of another seeking to recover damages from a railroad company for injuries sustained by him while shifting or moving a car on a siding, which had been left safely standing on such siding by the company for the purpose of being unloaded, is not entitled to recover, *unless he shall make it appear that he was thus moving or shifting the car by authority from the company,* or at least that the invitation extended to him to unload such *car embraced such authority."* (Italics ours.)

The evidence did not prove the plaintiff's case as laid in count 1, in that it failed to show any express authority from the defendant, and the court did not err in directing a verdict for the defendant in respect to that count. We think, however, the evidence introduced was such as to require its submission to the jury under counts 2 and 3. Testimony for the plaintiff was to the effect that the brake on the car being used by McDaniel was one with a cog wheel or latch exposed on the floor of a small platform upon which the operator stood at the end of and outside of the car, while the testimony on behalf of the defendant was that all of the cars delivered on the date of the injury were equipped with a more modern type of brake, the Miner Ideal Safety brake, which had a mechanism composed of a cog wheel and pawl and spring instead of a simple latch, which improved mechanism was not exposed, was entirely enclosed in a housing on the head of the brake staff. There was also testimony that even if either type of brake mechanism became defective it could not injure an operator, because the brake lever at the top of the brake staff used by the operator in braking the car, would not move towards but away from him, upon being released, and would harmlessly drop down to a vertical position. Nevertheless the deceased's testimony by deposition was to the effect that just as the car came to a stop in the process of braking he turned the lever loose, that in some way the latch, which was by his foot kicked into the cog wheel on the old style mechanism, failed to hold, and the lever struck him in his abdomen. E. D.

Pittman, the only eye-witness to the occurrence, testified that the brake mechanism was of the old type, and that the cog wheel broke half way across after the deceased had applied the brake, and that the lever struck him just as he was preparing to dismount from the car; that he saw the cog wheel afterwards and it had in it a flaw that made a crack all the way across it. He further testified that as McDaniel was preparing to get off of the car a runaway car, which had been placed by the defendant for unloading by the consignee, bumped into the one McDaniel was on, the impact thus breaking the cog which had a flaw across it, and that McDaniel was thrown against the lever or upper part of the brake staff and his injury caused in this manner; that he was thrown down and was confused and really did not know that the dislocation of the mechanism was caused by the runaway car.

Against this testimony as to the defective mechanism and old type of brake, there was testimony on behalf of the defendant that repeated inspections had been made of the cars placed for unloading on the date of the injury, including an inspection of the brakes according to the rules of the Intersate Commerce Commission, and it is contended by the defendant that the railway was not an insurer of the safety of the brakes and had used ordinary care and fulfilled the only duty it owed to the plaintiff, if it could not be said that the sole obligation upon it was not to wilfully and wantonly injure the deceased. Notwithstanding the defendant's evidence as to the inspection of the brakes, and the further fact that there was some testimony which might, in the opinion of the jury, to whom the question should have been referred, discredit the witness Pittman's veracity, still if McDaniel and Pittman are to be believed the car being moved by the deceased was equipped with an old style defective brake which, according to Pittman, had a flaw in its cog wheel which was readily discoverable by a reasonable inspection.

In the brief of counsel for the defendant the contention is made that the plaintiff is concluded by a stipulation between the parties that none of the cars placed for the deceased's employer on the date of the injury was of the old type brake mechanism. Counsel for the plaintiff insist that the stipulation, which is set out in hæc verba in the foregoing statement of the case, was only to the effect that certain *records* showed the new type mechanism as being on

the cars, and insist that the testimony of the deceased and the witness Pittman made an issue in respect to the type of brakes on the car operated by McDaniel. As will be observed from a reading of the stipulation, it begins by stating that "the records of" the shipper show that certain described cars of stone were shipped to the deceased's employer. From this statement separated by successive semicolons are other declarations as to what the records of the Georgia Railroad and the Central of Georgia Railway Company show as to the cars in question. It is then stated that "It is further stipulated that . . none of them [the cars] was equipped with the type of brake having the ratchet exposed or on the platform or footboard." Then another statement is made that the defendant operated a mixed train from the latter part of 1932, and through January and February, 1933. In construing a written paper the intention of the parties must always be sought, and in this undertaking the circumstances surrounding the parties may be looked to. It would, we think, be a strained construction to say that, with the plaintiff putting in evidence, unobjected to by the defendant, to the effect that the brake mechanism was of the old type, the plaintiff was at the same time consenting to being put in the position of agreeing that the stipulation entered into should be admitted in evidence as agreeing, not merely that the records of the railway showed certain facts about the car equipment, but that the plaintiff was admitting that, independently of such records, none of the cars was equipped with the old style brake mechanism. Under the facts and circumstances we think it would be going beyond the bounds of reason and justice to accept the interpretation placed upon the stipulation by the defendant. Accordingly, in the conflict made as to alleged negligence of the defendant in respect to the brakes, the issue was one for the determination of the jury and not by the trial judge, and, it being undisputed that McDaniel was injured while moving the car, it was also a jury question as to whether or not his injury was due to the alleged defective brake mechanism. It follows that as to counts 2 and 3 the court erred in directing a verdict for the defendant.

According to the allegations of count 4, the car being operated by McDaniel was run into by one of the loaded cars getting away from the string of cars which had been left by the defendant westwardly of the crane, the impact thus causing him to be thrown

against the brake staff head and lever just as he had completed the act of braking the car he was on. There was no allegation that the cars were left uncoupled by the railroad, and the evidence was silent as to whether or not the cars were coupled or uncoupled. It was alleged that the cars were not chocked, but if they were left coupled by the railroad the failure of the railroad to chock the car that ran away would not amount to negligence, because if coupled together one car would not have proceeded towards the crane by itself. The evidence failed to show that after the railroad placed the cars neither the deceased nor any other person uncoupled the car that "ran away," and in this situation the jury would not be authorized to apply the doctrine of res ipsa loquitur and draw the inference that the defendant was negligent in this respect, and, as stated, it was not alleged that the defendant did uncouple any of the cars when placed. The evidence did not authorize a recovery under count 4 of the petition, and the court did not err in directing a verdict for the defendant on that count.

■ The defendant filed general and special demurrers to all counts of the petition. Upon these demurrers being overruled by the court, the defendant duly preserved objections by exceptions pendente lite, and by cross-bill of exceptions error is assigned thereon. In our opinion all grounds argued and insisted upon are without merit as to all counts of the petition, and any detailed discussion is not deemed desirable or profitable, especially in consequence of what is said in the foregoing opinion on the merits of the case, except in respect to the ground of demurrer that count 4 sets forth a new cause of action. The amendment by adding this count is not subject to the objection urged. The wrong complained of is the original wrong set forth in the petition, namely, the failure of the defendant to exercise ordinary care towards the deceased while he was in the act of moving a loaded car which had been placed by the defendant for unloading, and the amendment merely varies the allegations as to the manner in which the injury occurred. "A single wrong may be composed of numerous elements and shown by various facts." *Ellison* v. *Georgia Railroad Co.*, 87 *Ga.* 691, 710 (12 S. E. 809); *City of Columbus* v. *Anglin*, 120 *Ga.* 785, 792 (48 S. E. 318); *Chestnut* v. *Weekes*, 180 *Ga.* 701 (180 S. E. 716). A petition may be amended at any stage of the cause provided there is enough in the pleadings to amend by. Code, § 81-1301.

*Judgment reversed on the main bill of exceptions, as to counts 2 and 3 of the petition. Judgment affirmed on the cross-bill. Stephens, P. J., and Felton, J., concur.*