**William E. WHITLOCK**

**v.**

**UNITED STATES of America.**

**Civ. A. No. 5565–R.**

United States District Court
E. D. Virginia,
Richmond Division.

Feb. 12, 1969.

Allen, Allen, Allen & Allen, Wilbur C. Allen, Richmond, Va., counsel for plaintiff.

A. R. Bowles, III, Richmond, Va., counsel for C & O.

E. Milton Farley, III, Robt. L. Dolbeare, Richmond, Va., counsel for Atchison & Topeka.

James A. Oast, Jr., U. S. Atty., Richmond, Va., counsel for United States.

## MEMORANDUM

STERLING HUTCHESON, District Judge.

Plaintiff seeks to recover damages for personal injuries sustained as a result of a collision between a railroad box car and a truck trailer at the Cheatham Annex Naval Supply Center (Norfolk), Williamsburg, Virginia, (a government installation) on May 17, 1967.

Jurisdiction is founded upon the Federal Tort Claims Act (28 U.S.C. Sections 2671–2680 and Section 1346 [b]). Two other defendants to the action as filed, the Chesapeake and Ohio Railway Company and the Atchison, Topeka and Santa Fe Railroad Company, were dismissed for lack of jurisdiction by order of January 8, 1969.

The railroad car involved was transported from Kansas City, Missouri, by the Santa Fe road to Chicago. It was there delivered to the Chesapeake and Ohio which transported it over its lines from Chicago to Penniman, Virginia, an interchange terminal junction, and marshalling yard some four or five miles from Cheatham Annex. On the morning of delivery at Penniman on May 17, 1967, the train of which the car was a part was inspected at the Fulton Yard of the Chesapeake and Ohio at Richmond, Virginia. At the Penniman Yard a cut consisting of ten cars, including the one in question (identified as SFRC 50816), was made and delivered to the government for transportation by it over its line to Cheatham Annex. The transportation from this interchange to Cheatham Annex was effected by a locomotive owned by the government and operated by its employees acting within the scope of their employment. The conductor of the government operated train was a truck driver who substituted as a railroad employee and from time to time was assigned various duties in the operation of the government owned railroad. The members of the train crew employed at the Cheatham Annex were considered qualified to operate the locomotives and rolling stock on the government line by "on the job" training they had received.

Following receipt from the Chesapeake and Ohio of the cut of cars, the train crew made a visual inspection of the cars by walking the length of the train and seeing that the brake shoes appeared to be set in against the wheels when the government train was made up. Thereafter the train with the car in question proceeded into the internal marshalling yard at Cheatham Annex under control of government employees. In order to place each car at its appropriate unloading dock it was necessary to rearrange the order of their respective locations in the train through a series of switching operations which included disconnecting the car in question and leaving it on a ladder track for approximately three or four minutes.

When uncoupled, and as soon as the locomotive was disconnected, the Santa Fe car began rolling along the ladder track which had a grade of 0.3752°. The conductor immediately boarded the car and attempted to set the hand brake. The brake failed to function although tied down as far as it would go and the car continued rolling.

At the time, plaintiff, who was employed by Russell Beverley Company as a truck driver, was engaged in unloading a trailer parked at the Navy Department's cold storage warehouse loading dock at a place designated by the defendant and customarily used by truck operators at the Cheatham Annex. The ladder track extended through this loading area to another loading platform. This is a type of arrangement commonly employed throughout the railroad and private industry. The rolling car proceeded for approximately 1530 feet before it struck the trailer in which plaintiff was working, parked in the loading zone. After the collision, an investigation revealed that the failure of

the brake was caused by a defective automatic adjusting lever composing a part of the brake system. While the lever was referred to by various names, for present purposes it will be referred to as the broken brake rod. The break in the rod caused it to be bent out of position and to fail to connect with a bracket in which it normally functioned. This break and bending caused both the air brakes and hand brakes on the car to be inoperative. The court finds that the proximate cause of the injuries received by the plaintiff was the failure of the brake system on the Santa Fe car. While not dispositive of the issue of negligence at bar, the court heard testimony from several witnesses as to the possible length of time the rod may have been broken who estimated the time from one day to several days. The court finds it unnecessary to find as a fact the length of such time but does find that a reasonable and effective inspection by the government employees at Penniman should have disclosed this damaged brake rigging.

Plaintiff bases his complaint on the government's failure to properly inspect the Santa Fe car before it was brought into Cheatham Annex and also alleges negligence of the government train crew in failing to follow the safety regulations adopted and in use at Cheatham.

The practice in the industry is to inspect rolling stock during a long haul at intervals of approximately 500 miles and for the receiving carrier to make inspection at the time of delivery to it. One method of inspection is by what is known as the Terminal Air Test and there is also another method of making a visual inspection. Neither was employed. The brake assembly was located beneath the floor of the car and fully exposed to view. A visual inspection would have necessitated assuming a stooping position from which the defective condition would have been clearly visible. (Plaintiff's Exhibits 6 and 7).

The brake shoes were inspected in recognition of some sort of responsibility but the vital brake rod and bracket, both of which were clearly visible, were not given a casual glance.

The government contends that there was no duty on it to inspect the brake system of cars received from carriers at the interchange but that the train crew personnel at Cheatham Annex were justified in assuming that cars received from the delivering line would be delivered with efficient brakes and in a generally safe condition.

A review of the copy of the Cheatham Naval Annex Safety Regulation (Plaintiff's Exhibit No. 2) discloses that it contains no directions for a safety check on incoming rolling stock. In fact those regulations have no bearing on the case.

It is not contended that the Safety Appliance Act of 1910 (45 U.S.C. § 11) is applicable. Therefore, the question involved is whether the government was guilty of common law negligence in failing to discover the defective condition of the brake system of the car before transporting it over its line.

No case precisely in point has been found. However, there are cases which throw light upon the subject.

While there are cases holding that a delivering railroad is liable to the consignee for negligence in failing to make reasonable inspection to deliver a car in safe condition to a consignee, those cases involve consignees to whom the contents of the cars had been consigned to be unloaded after the cars had been placed in position for unloading on its track by the delivering carrier. 75 C.J.S. Railroads § 924, at pages 333, 334; Weeks v. Pollard, 65 Ga.App. 377, 16 S.E.2d 225; Chicago, Rock Island & Pacific R. R. Co. v. Williams, 245 F.2d 397 (8th Cir. 1957); Cf. Waldron v. Director General of Railroads, 266 F. 196 (4th Cir. 1920). The distinguishing feature here is the fact that the Santa Fe car and contents were delivered to the government for the purpose of not only

unloading the contents but of transporting the car as a component part of a railroad train transported by the government over a line owned and maintained by it. It follows that the government was not a consignee in the commonly accepted definition but was more nearly in the position of a railroad operator receiving rolling stock from a delivering carrier. The duty to inspect, now followed in practice, is for the receiving carrier to inspect the rolling stock received from the delivering carrier who makes delivery without inspection at the terminal is recognized in Risque's Administrator v. Chesapeake & Ohio Ry. Co., 104 Va. 476, 51 S.E. 730 (1905). There the railroad delivered to an ore and iron company for transportation over the line of that company for loading on its line certain rolling stock with defective brakes. While that case turned upon the question of contributory negligence, the court said:

> "If these cars were without brakes, or equipped with unsound brakes, it was the duty of the ore and iron company to ascertain the fact by proper inspection, and either remedy the defect or decline to use the cars".

Veale v. Norfolk & Western Railway Company, 205 Va. 822, 139 S.E.2d 797 (1965) also recognized this duty. In that case, the Norfolk & Western received the car from Minneapolis & St. Louis Railroad Corp. for transporting to South Norfolk, Virginia, for delivery to the grain elevators of Cargill, Inc., a grain storage company. At South Norfolk, it was delivered to Belt Line which in turn delivered it to Cargill. Upon delivery to Cargill a switch engine operated by Cargill moved the car over tracks owned or leased by Cargill. In these operations plaintiff, an employee of Cargill, was injured. Both Norfolk & Western and Portsmouth Belt Line Railroad Company were defendants to the action. The court speaking through Justice Buchanan in sustaining the demurrers said:

> "From the facts alleged it appears that the Norfolk and Western was, with respect to the car which caused the injury, an intermediate carrier. It received the car from Minneapolis & St. Louis Railroad Corporation and delivered it to Belt Line. As such intermediate carrier it owed no duty to the plaintiff to inspect or examine the car to see whether it was in a safe condition for the plaintiff to unload it. In 75 C.J.S. Railroads § 924 at p. 337, it is said: 'An intermediate carrier by rail is not obliged to inspect a car for the benefit of the consignee or of the employees of the consignee and does not owe a duty to them with respect to the safe condition of the car for unloading' ".

The demurrer filed by Norfolk & Western was sustained.

It was contended by Belt Line that it was an intermediate and not the ultimate carrier. The court said:

> "In the present case the Belt Line was not the ultimate carrier in the sense that it had the final charge and control of the car which caused the plaintiff's injury. Before the injury occurred, plaintiff's employer, the consignee (Cargill), had taken control of the loaded car, transported it over its own tracks by its own engine, placed it on its hydraulic dumper, unloaded it and returned the empty car to the employer's tracks to be coupled to its engine, and when the empty car was jolted by the engine in making the coupling its sliding metal door fell and injured the plaintiff. We hold that under the circumstances Belt Line was not chargeable with duty of inspection ordinarily resting upon a delivering carrier".

The demurrer as to Belt Line was also sustained.

■ While it is not suggested that the delivering carrier is not liable in proper circumstances for negligence in delivering cars to a consignee for load-

ing or unloading, it would appear that here the government occupies the position of ultimate or delivering carrier with the duty to make a reasonable inspection of the car before transporting it over its own line. It knew, or should have known, the custom under which the delivering carrier makes no inspection at the time of delivery. The danger involved in moving, uncoupling and switching railroad box cars weighing many tons without adequate braking equipment is obvious. It is equally obvious that this danger is increased when the trackage is located on an incline. The court holds that in this case failure to make a reasonable inspection was negligence and such negligence was the proximate cause of the injuries received by plaintiff.

The damages sustained by the plaintiff may be briefly summarized as follows:

At the time of the injuries, plaintiff was 31 years of age with a life expectancy of 40 years. He was married and the father of two children. He sustained injuries to his lumbar spine and has been unable to pursue his occupation as a truck driver or any other job involving somewhat heavy work. The medical evidence shows that he has a probable degeneration of the fifth interspace disc and that a spinal fusion should be had. The disability prevents him from engaging in his normal occupation as truck driver or as manual laborer. Should the fusion operation be a success the disability may be reduced to a figure of approximately 10%. Without the operation the disability is approximately 25%. As a result of his injuries he has lost employment of 315 days from the time of the receipt of injuries to the date of trial at an average wage of $97.00 per week; he has incurred hospital expenses, doctors' bills, miscellaneous expenses including estimated future expenses for an operation. As a result he has sustained special damages of approximately $8500 not including future loss of wages or earning capacity nor for pain and suffering.

Judgment will be entered in accordance with this memorandum which is adopted as Findings of Fact and Conclusions of Law as provided by Rule 52, Federal Rules' of Civil Procedure.